**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 15-cv-0699-WJM-MEH

JULIE JOHNSON,

      Plaintiff,

v.

LIFE INSURANCE COMPANY OF NORTH AMERICA,

      Defendant.

---

### ORDER AFFIRMING TERMINATION OF BENEFITS

---

In this case brought pursuant to 29 U.S.C. § 1132(a) of the Employee

Retirement Income Security Act of 1974 ("ERISA"), Plaintiff Julie Johnson ("Johnson")

challenges the decision of Defendant Life Insurance Company of North America

("LINA") to terminate her long-term disability insurance benefits.  (ECF No. 1.)  Currently

before the Court is Johnson's Motion for Bench Trial on the Record (ECF No. 51) and

the parties' Joint Motion for Determination (ECF No. 61).  Both motions seek the same

thing: administrative review of LINA's decision.  For the reasons explained below, the

Court finds that LINA's choice to terminate Johnson's disability benefits was not

arbitrary or capricious, and its decision is therefore affirmed.

Also before the Court is Plaintiff's Motion to Strike.  (ECF No. 66.)  The Court

denies this motion as moot.

## I.  BACKGROUND

### A.  The Plan

On October 19, 2007, UBS Financial Services ("UBS") hired Johnson as a "Vice President Financial Advisor/Consultant" at a salary of $10,833.33 per month.  (ECF No. 51 at 11–12, ¶¶ 4, 6.)[1]  Johnson then became covered under the UBS Long-Term Disability Plan ("Plan").  (*Id*. ¶¶ 1, 5.)  That Plan provides long-term disability benefits in two phases.  The first phase defines disability as follows: "if, because of Injury or Sickness, you are unable to perform all the material duties of your *regular occupation*, and solely due to Injury or Sickness, you are unable to earn more than 80% of your Indexed Covered Earnings."  (Administrative Record ("R.") (ECF Nos. 17, 29, 37) at 3178 (emphasis added).)  The second phase applies after benefits under the first phase have been paid for 24 months, and tightens the definition of disability by requiring more than just inability to perform the individual's regular occupation: "if your Injury or Sickness makes you unable to perform all the material duties of *any occupation for which you may reasonably become qualified* based on education, training or experience, and solely due to Injury or Sickness, you are unable to earn more than 80% of your Indexed Covered Earnings."  (*Id*. (emphasis added).)

Defendant LINA administers claims under the Plan.  (ECF No. 51 at 11, ¶ 3.) LINA also pays any approved benefits.  (*Id*.)

---

[1] All ECF page citations are to the page number in the ECF header, which does not always match the document's internal pagination, particularly in documents with prefatory material such as a table of contents.

**B.     Short-Term Disability Claim**

Johnson applied for short-term disability benefits (not the same as the "regular occupation" long-term benefits discussed above) on October 6, 2010.  (R. at 341.)  For some time prior to this date, Johnson had been struggling with various medical conditions largely flowing from dysautonomia, a disease in which the autonomic nervous system fails to function properly.  Dysautonomia manifested itself in Johnson primarily through an erratic heart rate and unpredictable drops in blood pressure, which in turn could lead to syncope (fainting due to insufficient blood flow to the brain), headaches, slow thinking, severe fatigue, impaired speech, and inability to cope well with stress.  (ECF No. 51 at 13–14, ¶ 9.)

Many of Johnson's treating physicians submitted their diagnoses to LINA.  In addition to the above-stated diseases and symptoms, these physicians also noted bradycardia (abnormally slow heart activity), lack of coordination, dizziness, hand tremors, postural tremors, fibromyalgia, and sleep disruption.  (*Id*. at 14–18, ¶¶ 11–20.) In December 2010, LINA awarded short-term disability benefits to Johnson, effective through April 3, 2011 (the maximum length available for such benefits).  (*Id*. at 18, ¶ 22.)

**C.     "Regular Occupation" Long-Term Disability Claim**

In February 2011, LINA "transitioned" Johnson's short-term disability claim to a review of entitlement to the first phase of long-term disability benefits, *i.e.*, under the "regular occupation" standard.  (*Id*. at 18, ¶¶ 23–24.)  In a disability questionnaire filled out in March 2011, Johnson reported her "primary physical and/or mental condition preventing [her] from working now" as follows: "Cognitive dysfunction, bad balance,

dizziness, headaches, black outs, fibromyalgia = pain, challenge in articulating thoughts, especially under stress."  (R. at 983.)

That same month, Johnson's neurologist, Dr. Maureen Leehey, submitted a "Medical Request Form" to LINA.  (R. at 977.)  In the form's box labeled "What is the primary diagnosis?", Dr. Leehey wrote, "dysautonomia[,] fibromyalgia[,] tremor."  (*Id*.)  In the form's box labeled "What are the specific additional factors impacting return to work, if any?", Dr. Leehey wrote, "hand tremor limits ability to perform routine activities[,] lightheadedness, sometimes severe headaches (daily, continuous)[,] severe fatigue[,] poor sleep[,] cognitive dysfunction[,] gait impairment[,] inability to tolerate extended standing."  (*Id*.)  Dr. Leehey further wrote that the symptoms resulted from her primary diagnoses "and prevent any sustained mental or physical activities."  (*Id*.)

In April 2011, LINA denied Johnson's long-term disability claim, largely citing the results of a neuropsychological evaluation LINA had ordered, which suggested that Johnson could continue to perform her normal job with certain "assistive strategies." (R. at 612.)  Johnson then invoked LINA's internal appeals process and submitted various additional letters from her treating physicians and from other medical professionals.  (ECF No. 51 at 20–22, ¶¶ 33, 35, 39, 40.)  Johnson also challenged LINA's classification of her former employment as "office and clerical" with a specific job description of the "brokerage clerk II."  (*Id*. at 21–24, ¶¶ 38, 41–45.)  Johnson considered her correct job title to be "financial consultant."  (*Id*. at 22, ¶ 42.)

As part of reviewing Johnson's appeal, LINA sent Johnson's medical file for review to a third-party physician, Ira Weisberg, and a third-party psychologist, Monica Lintott.  Dr. Weisberg found insufficient objective evidence of Johnson's disability, and

reported a conversation with Dr. Leehey in which Dr. Leehey expressed her view that "there was a fair amount of somatization on [Johnson's] part" (R. at 693), or in other words, expressing psychological symptoms as physical symptoms.  Dr. Lintott, however, evaluated Johnson's neuropsychological testing and agreed with Johnson's position that she had significant impairments preventing her from continuing as a financial consultant in light of that profession's high-responsibility, detail-oriented nature.  (*Id*. at 24, ¶¶ 46–47.)  In December 2011, LINA reversed its previous denial and approved Johnson's long-term disability claim.  (*Id*. ¶ 48.)

D.     **Social Security Disability Award**

In the midst of the foregoing, LINA required Johnson to apply for Social Security Disability benefits, which, if awarded, would reduce LINA's payment obligation dollar for dollar.  (*Id*. at 25, ¶ 49.)  LINA paid for a third-party organization to represent Johnson in that process, and the application was filed in March 2011.  (*Id*. ¶ 50.)[2]  A Social Security Disability Examiner physician determined (apparently based on a file review) that Johnson's severe, medically determinable impairments were recurrent arrhythmias, fibromyalgia, disorders of the autonomic nervous system, discogenic and degenerative disorders of the back, and organic brain syndrome.  (*Id*. ¶ 51.)  The examiner concluded that Johnson could not sustain a 40-hour work week due to her impairments.  (*Id*. ¶ 53.)  In June 2011, the Social Security Administration found Johnson disabled and awarded her SSDI benefits.  (*Id*. ¶ 54.)

---

[2] Obviously, March 2011 precedes the December 2011 date on which LINA awarded long-term disability benefits.  No party explains why LINA was seeking to reduce its payment obligation at a time when it believed it had no payment obligation.

### E.   "Any Occupation" Long-Term Disability Review

In August 2012, LINA informed Johnson that the second phase of long-term disability benefits would apply beginning in April 2013.  (*Id*. at 26, ¶ 55.)  In other words, Johnson's entitlement to benefits beginning in April 2013 would turn on whether she was incapable of performing "any occupation for which [she] may reasonably become qualified based on education, training or experience" that would pay her 80% of her prior salary.  (R. at 3178.)  LINA informed Johnson that it had "begun a review to determine if [Johnson would] remain eligible for benefits" under that standard.  (R. at 586.)  LINA noted that it would request "current information from both [Johnson] and [her treating] physicians."  (*Id*.)

In truth, LINA had begun requesting updated information from Johnson the previous month.  Specifically, on July 16, 2012, LINA sent Johnson a form to fill out titled "Disability Questionnaire & Activities of Daily Living."  (R. at 588–91.)  Johnson filled out and returned that form about a week later.  (*See* R. at 2456.)  The form begins by stating, "In your own words, tell us why you cannot work in your own or in any occupation."  To this, Johnson responded, "Need to nap every day, dizzy/syncope often, chronic migraines, poor memory, hospitalization."  (R. at 2458.)  In response to the question, "What is [the] primary physical and/or mental condition preventing you from working now?", Johnson answered, "Migraines, syncope, poor mental acuity."  (*Id*.)  Johnson noted that she frequently needed to use the handrails in her home to go up and down stairs, and that she had "oxygen to help."  (*Id*.)  She also stated that she goes for walks "3 days/week" but "not far" and only for "15–20 minutes with help."  (*Id*.)

6

LINA then obtained updated information from Johnson's physicians.  In August 2012, it received a Physical Ability Assessment ("PAA") from Dr. Howard Weinberger, Johnson's cardiologist.  (R. at 2452.)  In the PAA, which is similar to a residual functional capacity assessment in Social Security disability cases, Dr. Weinberger diagnosed syncope, autonomic dysfunction, and migraine headaches.  (*Id.*)  He then opined that Johnson could perform the following activities "Constantly" (greater than 5.5 hours per day): sit, reach, manipulate with both hands, grasp with both hands, see, hear, and use lower extremities for foot controls.  (*Id*. at 2452–53.)  Dr. Weinberger further opined that Johnson could perform the following activities "Occasionally" (from zero to 2.5 hours per day): standing, walking, lifting up to twenty pounds, and carrying up to twenty pounds.  (*Id*.)

In September 2012, LINA received a response from Dr. Leehey, Johnson's neurologist, to a letter sent by LINA the month before asking for recent medical records.  (R. at 2189.)  Dr. Leehey wrote in that response that Johnson "cannot do prolonged activity of any kind, including mental activity under pressure," that she "needs frequent rest periods [due to] fatigue," and that "tremor causes dexterity problems, [she] needs longer to do things."  (*Id*.)  Dr. Leehey also returned a PAA on which she diagnosed tremor, postural imbalance, migraines, concentration deficit, and episodic lightheadedness.  (R. at 2191.)  Dr. Leehey opined that Johnson could sit only "Occasionally" throughout the day, as compared to Dr. Weinberger's "Constantly."  Dr. Leehey also opined that Johnson could manipulate and grasp "Frequently" (2.5–5.5 hours per day), as compared to Dr. Weinberger's "Constantly."  (*Id*.)

In October 2012, LINA received a response from Dr. Donald Rollins, Johnson's

pulmonologist, to a letter sent by LINA asking for recent medical records.  (R. at 2131.)
Dr. Rollins referred LINA to Dr. Weinberger with respect to Johnson's "history of
autonomic dystonia and syncope, which is the reason for her disability."  (*Id*.)
Dr. Rollins then attached an August 2012 treatment note from Dr. Weinberger, which
stated, among other things, the following:

> There has been some suspicion and some evidence of
> possible autonomic dysfunction; however, recent evaluation
> at [the] Mayo Clinic did not find definitive evidence for
> autonomic failure or multisystem atrophy.  The patient did
> have one episode of syncope in 06/2012 associated with an
> acute [gastrointestinal] illness, but otherwise has had no
> other true syncope since 09/2011.

(R. at 2135.)

These somewhat conflicting reports from Johnson's physicians apparently raised
LINA's suspicions, because LINA next arranged for covert surveillance of Johnson from
October 18 through October 20, 2012.  (R. at 2102.)  The surveillance contractor
reported no activity on the first day.  (R. at 2109.)  The second day, however, was much
more eventful.  In the mid-morning, Johnson exited her house and went on a 35-minute
walk around her neighborhood while pushing a baby stroller and walking two dogs.
(R. at 2110.)  "She appeared to perform this activity in a fluid manner."  (*Id*.)  In the late
morning, Johnson again left her house and drove approximately twenty miles to a
restaurant where "she sat, ate, and spoke to an unidentified female."  (R. at 2111.)  She
again "appeared to perform this activity in a fluid manner."  (*Id*.)  Johnson was then
observed going into a nearby movie theater with her lunch companion, and exiting
about ninety minutes later, yet again performing all of these activities "in a fluid
manner."  (R. at 2112.)  She finally drove herself home in the mid-afternoon.  (*Id*.)

8

On the morning of the third day of surveillance, Johnson was observed putting gas in her car at a gas station "nearby" her home, then briefly visiting a tire store, and then spending 84 minutes at a park approximately eight miles from her home, where her children were playing a soccer game. (R. at 2114.) She then briefly went back to the tire store, and finally returned home in the early afternoon. (R. at 2115.) All of this was apparently done "in a fluid manner." (R. at 2114.) The surveillance contractor observed nothing else of interest that day.

LINA next arranged for an independent medical examination ("IME"). A third-party vendor scheduled that IME with John Bermundez, Ph.D., a psychologist. (R. at 2076, 2085.) Either shortly before or after the exam, which took place on December 17, 2012, Dr. Bermundez reviewed 720 pages of Johnson's medical records. (R. at 2085, 2087.) At the exam itself, Johnson "had a wheeled oxygen tank in tow, and she kept the can[n]ula [tube delivering oxygen to the nostrils] in place during the examination and testing." (R. at 2089.) Dr. Bermundez also noticed "a rather co[a]rse tremor of the fingers of the right hand at the start of the examination," but the tremor "ceased with distraction and was absent for the remainder of the examination except for one or two very brief moments" when Johnson "seemed to be gazing at her hand." (*Id.*) With respect to Johnson's syncope, Johnson reported to Dr. Bermundez that her symptoms were "due to orthostatic hypotension [sudden drop in blood pressure when quickly standing up]" and were "manageable by not rising too quickly from a seated or reclining position." (*Id.*)

Dr. Bermundez administered numerous psychological tests over approximately five hours. (*Id.*) In evaluating Johnson's testing performance, Dr. Bermundez reported

9

> strong indications of feigned symptoms that seemed to be
> selectively focused to present her as afflicted with both
> memory impairments and impaired ability to calculate and to
> process symbols.  This was demonstrated by her
> extraordinar[ily] biased test responses, and by selectively
> slower production on certain timed tasks, and spontaneous,
> rapid responses in other contexts.  Therefore, certain of her
> test results are in my opinion invalid representations of true
> weakness, if any, [and are] inconsistent with [Johnson's]
> described complaints and symptoms.  Based on clinical
> observation and analysis of her test abilities it is my
> professional opinion that her concentration, memory and
> attention are intact and unimpaired.

(R. at 2090–91.)  Dr. Bermundez further reported that Johnson's test scores "were so

unlikely that the results could statistically and reasonably only have been due to

deliberate selection of incorrect responses. . . .  The possibility of malingering could not

be ruled out."  (R. at 2091.)  Dr. Bermundez ultimately concluded that Johnson

possessed all of the "[t]emperaments and [a]ptitudes" necessary to perform well in a

high-responsibility, detail-oriented workplace.  (R. at 2096.)

    In January 2013, LINA sent Dr. Bermundez's report to Michele Colella, an in-

house vocational rehabilitation counselor, for a "transferable skills analysis."  (R. at

2082.)  Colella determined that the "brokerage clerk II" job title relied upon in Johnson's

earlier "own occupation" proceedings was incorrect in light of Johnson's self-reported

work history.  (R. at 221; *see also* Part I.C, above.)  Colella determined that "registered

representative" was the appropriate title.  (R. at 221.)  Applying that title, Colella

determined that Dr. Bermundez's findings showed Johnson capable of continuing to

work as a registered representative, her "previous occupation."  (R. at 2082.)  Thus,

there was at least one job Johnson could perform, according to Colella, who then

turned to the "any occupation" disability definition's requirement that the job earn at

10

least 80% of Johnson's prior salary.  Colella calculated Johnson's "indexed" monthly earnings at $11,180 per month, meaning that a registered representative must normally make $8,944 per month or LINA cannot consider it when determining Johnson's disability status.  (*Id*.)  Colella found, however, that registered representatives in the Denver-Aurora metropolitan statistical area (which encompasses Johnson's home) earn $9,561 per month, or more than 80% of Johnson's indexed monthly wage.  (*Id*.)  Thus, according to Colella's analysis, Johnson no longer qualified as disabled.

At the same time Colella was preparing her analysis, LINA was continuing to review Johnson's eligibility in other ways.  On January 3, 2013, a LINA employee called Johnson to find out whether the Social Security Administration had recently reevaluated Johnson's SSDI benefits.  (R. at 231.)  According to LINA's report of the call, Johnson responded that a reassessment took place "approximately 6 mo[nths] ago."  (*Id*.)  The next day, LINA called again "to clarify when [Johnson] had her testing and evaluation by the SSA."  (R. at 230.)  This time Johnson reported that she was "not sure when she had the re-evaluation by SSA but she know[s] it was last year but not sure if it was in the last 6 months."  (*Id*.)  LINA therefore secured Johnson's authorization to obtain her file directly from the Social Security Administration.  (R. at 560–61.)  LINA obtained that file in February 2013 and learned that all of the medical documents dated from 2010 and 2011 (R. at 222), or in other words, the Social Security Administration had not recently evaluated Johnson's disability status.

LINA's final step before concluding its "any occupation" investigation was to send Dr. Bermundez's IME report to some of Johnson's physicians, including Dr. Weinberger (cardiologist), Dr. Rollins (pulmonologist), and Dr. Leehey (neurologist).  (R. at 550–55.)

Each of these letters stated in relevant part,

> We received the results of an Independent Medical
> Evaluation (IME) conducted on December 17, 2012
> regarding your patient, Julie Johnson.  The [IME] report
> concluded that your patient demonstrated an ability to
> perform sedentary work . . . .
>
> We are currently reviewing your patient's claim [of] Long
> Term Disability benefits.  Please review and respond to the
> attached [IME] report. . . .  If the requested information is not
> received by February 20, 2013, we will make a decision
> based on the information we currently have on file.
>
> Please indicate whether you agree or disagree with the
> [IME] report enclosed.  If you agree, please check the
> appropriate box [below] and return this letter via fax.  If you
> disagree with this report, please provide [a] detailed
> objective rationale and office records to support your
> findings.

(*See, e.g.*, R. at 550.)

Dr. Weinberger faxed a response on February 19, 2013.  (R. at 2030–32.)  He

checked the "No, I disagree" option but provided no support beyond a single sentence:

"Pacemaker has not resolved episodes of syncope."  (R. at 2031.)

No other physician responded by the February 20 deadline, in spite of LINA's

efforts to ensure a response.  In particular, LINA left voicemails for Dr. Leehey on

February 14 and February 15, seeking confirmation that Dr. Leehey had received the

February 13 fax and that she was aware of the February 20 deadline.  (R. at 210.)

On February 20 itself, LINA asked one of its in-house physicians, Dr. Donald

Minteer, to review the documentation gathered to date regarding Johnson.  (R. at

205–07.)  Dr. Minteer's major findings were as follows: (1) information from

Dr. Weinberger showed the ability to perform "a sedentary to light functional capacity"

12

job; (2) information from Dr. Rollins did not suggest that any pulmonary condition contributed to Johnson's alleged disability, and in particular, "[t]here is no documentation on why she was using the oxygen [tank]"; (3) Dr. Bermundez's IME report "opines there probably is no true cognitive disorder"; (4) covert surveillance showed Johnson "to be quite active" without the need for supplemental oxygen; and (5) Dr. Leehey's most recent treatment notes stated that Johnson's symptoms were "well controlled with present treatment," and that "[t]he next exam [was] scheduled for 6 months [from her previous exam] which implies a stable status."  (R. at 206.) Dr. Minteer therefore opined that "there are no current consistent objective clinical exam, clinical testing[,] or imaging documentation to support a significant ongoing physical or cognitive impairment which would preclude at least a sedentary[-]level occupation."  (R. at 207.)

By letter dated February 21, 2013, LINA informed Johnson that she would not qualify for "any occupation" disability benefits and therefore her benefits would end on April 4, 2013.  (R. at 497.)  LINA's letter summarized its investigation, with emphasis on the covert surveillance, Dr. Bermundez's report, and the lack of "consistent clinical exams, clinical testing or imaging documentation to support a significant ongoing physical or cognitive impairment which would preclude at least a sedentary[-]level occupation."  (R. at 498–99.)  The letter further announced LINA's conclusion that Johnson could work as a registered representative (what LINA had determined to be Johnson's prior occupation), and that such employment satisfied the earnings requirement.  (R. at 499.)

**F.      Post-Termination Records Submitted & First Appeal**

On February 22, 2013 (the day after LINA announced its decision), a nurse

practitioner under Dr. Leehey, Carol Hennessy, reviewed LINA's February 13 letter and

checked the space for "No, I disagree [with Dr. Bermundez's report]."  (R. at 2007.)[3]

Hennessy further explained,

> There has been no change in the following symptoms that
> limit Julie's ability to work at even sedentary jobs.  Her ability
> to perform any level of activity for an extended time (eg an 8
> hr day) is limited by fatigue, frequent lightheaded &
> presyncopal episodes, and difficulty concentrating and
> performing higher level cognitive functions under pressure,
> all of which are due to or exacerbated by dysautonomia,
> fibromyalgia, and other medical conditions.  In addition[,]
> severe incapacitating migraines continue to occur approx.
> once a week despite Botox injections.

(*Id.*)

It is not clear precisely when Nurse Hennessy transmitted this to LINA.  A

handwritten notation on the same document says "faxed 2-22-13" (*id.*), but it apparently

became part of a package that was actually faxed to LINA on March 5, 2013 (R. at

2004).  That package included an additional communication from Nurse Hennessy,

---

[3] This document contains a handwritten notation, "rec'd 2-21-13," which Johnson
interprets to mean that LINA actually never sent the February 13 letter until February 21, thus
intentionally preventing Dr. Leehey's office from timely responding by the already-elapsed
deadline of February 20.  (ECF No. 51 at 29, ¶ 70; *id.* at 75.)  However, Hennessy's response
shows a facsimile transmission header stating that the document was originally received by
Dr. Leehey's office on February 13, 2013 (R. at 2006), just as LINA claims.  But, adding to the
confusion, someone from Dr. Leehey's office called LINA on March 1, 2013, to request another
copy of the February 13 letter because the original was supposedly lost.  (R. at 199.)
Nonetheless, given the facsimile header and the undisputed record evidence, discussed
previously, that LINA called Dr. Leehey's office on February 14 and 15 to confirm receipt of the
February 13 letter and Dr. Leehey's understanding of the response deadline, the Court finds
that LINA engaged in no subterfuge to obstruct Dr. Leehey's response.  The Court presumes
that "rec'd 2-21-13" refers to when Nurse Hennessy was first given a copy of the February 13
letter.

14

specifically, a February 28 letter that reads in relevant part as follows: "Dr[.] Leehey and I are following Ms[.] Johnson for autonomic dysfunction.  She reports more frequent presyncopal episodes and reduced exercise tolerance.  She suffered a seizure yesterday following a syncopal episodes [*sic*]. . . .  We continue to feel that Julie is unable to work."  (R. at 2005.)

On March 6, 2013, Dr. Rollins (Johnson's pulmonologist) transmitted to LINA a February 28 "followup letter" to his September 2012 letter.  (R. at 2002.)  "Subsequent to that [September 2012] letter," Dr. Rollins wrote, "[Johnson] continues to have neuro cognitive disabilities, syncopal spells, and yesterday was actually taken by ambulance from her children's school after a syncopal spell and seizure."  (*Id.*)  Dr. Rollins further stated, "it is my understanding that [Johnson] is disabled because of her random episodes of syncope, cognitive dysfunction, [and] frequent episodes of dizziness, which have . . . caused her to have numerous hospitalizations and ER evaluations as recent[ly] as yesterday."  (R. at 2002–03.)

On March 25, 2013, LINA received from Johnson a handwritten letter stating, "I want to Appeal my Long Term Disability denial.  I will be sending in more information from doctors as test results are evaluated."  (R. at 1692.)  Apparently one of these tests was a neuropsychological evaluation performed on April 9, 2013 by Abigail Ritchie, Psy.D., a neuropsychology fellow at the University of Colorado School of Medicine. (R. at 3045.)  Dr. Ritchie performed this evaluation at Dr. Leehey's request for "a second opinion regarding [Johnson's] cognitive functioning" in light of Dr. Bermundez's opinions.  (R. at 3041.)  Dr. Ritchie major impression after administering numerous tests was as follows: "Unfortunately, symptom validity testing during the current evaluation

15

revealed a pattern of suboptimal effort on some cognitive testing.  Consequently

cognitive test scores could not be reliably interpreted as a valid reflection of the

patient's full cognitive abilities."  (R. at 3044.)

Dr. Ritchie's findings and report were reviewed by Thomas Wodushek, Ph.D., a

neuropsychologist and assistant professor at the University of Colorado School of

Medicine.  (R. at 3045.)  Dr. Wodushek stated no disagreement with Dr. Ritchie, and

perhaps for this reason, subsequent documents in the record, and the parties

themselves, generally attribute Dr. Ritchie's report to Dr. Wodushek.  For consistency,

the Court will do the same.[4]

Around the same time, Johnson underwent further pulmonary testing with

Dr. Rollins, leading to a letter Dr. Rollins transmitted to LINA in mid-May 2013.  (R. at

3024.)  Dr. Rollins reported a recent "pulmonary exercise test" in which Johnson

"developed hypotension during the study, was unable to complete the study[,] and

clearly had cardiac limitation."  (*Id.*)  Dr. Rollins opined that Johnson is "unable to work

at a full-time job or as a financial planner or consultant at this time . . . due to her

recurrent orthostatic hypotension and cognitive decline in the context of her autonomic

dysfunction, as discussed in detail in Dr[.] Weinberger's consultations."  (R. at 3025.)

Also in mid-May 2013, another neurologist, Dr. Katalin Pocsine, reported to LINA

her evaluation of Johnson after visits from Johnson in the previous two months.  (R. at

2039.)  Dr. Pocsine opined that Johnson suffered from "bradycardia, orthostatic

---

[4] It is not clear when or how LINA received Dr. Wodushek's report, but it certainly did, as evidenced by its presence in the administrative record and LINA's consideration of it during appeal proceedings, discussed below.

intolerance, irritable bowel syndrome, chronic fatigue, concentration difficulty, and mixed headache disorder." (*Id*.)  Dr. Pocsine further opined that Johnson could not return to her previous job or "any other job that requires concentration, [and] decision making.  She would not be able to handle [the] daily stress and pressure of an office job. [¶] This patient [is] unable to stand or sit for prolonged period[s] of time.  She needs to take frequent naps.  The patient still suffers from recurrent syncopes." (*Id*.)

In June 2013, Dr. Weinberger wrote to LINA, stating that Johnson "continues to have episodes of syncope and near syncope, which are unpredictable in nature and are not controlled with her current pacemaker or with continued medication adjustment.  She also complains of significant cognitive impairment, concentration and memory problems and inability to do simple calculations when previously she could do quite complex mathematic calculations in her head." (R. at 3028.)

In September 2013, Johnson formally appealed LINA's termination of benefits, submitting additional medical records, physician opinions, and argument regarding LINA's alleged errors in evaluating her claim.  (ECF No. 51 at 33, ¶ 88.)  LINA asked a third-party vendor to review the relevant records.  (*Id*. at 34, ¶ 91.)  The vendor then produced two "peer review reports," one from a physician and the other from a psychologist.  (R. at 1666–83.)

The psychologist's report, dated November 22, 2013, was authored by Kristin Fiano, Ph.D., who specializes in clinical neuropsychology.  (R. at 1683.)  Dr. Fiano's report recounts a telephone conversation she had with Dr. Leehey on November 21, 2013.  (R. at 1675–76.)  In that conversation, Dr. Leehey stated that Johnson had last been seen in July 2013 and "is still an active patient." (R. at 1676.)  Dr. Fiano

17

specifically asked Dr. Leehey about whether she "was aware of the validity issues raised in [Dr. Bermundez's IME report]. [Dr. Leehey] seemed unsure and looked up the chart while we were on the phone." (*Id.*) Dr. Fiano's summary of the conversation contains nothing about whether Dr. Leehey ever directly responded to the question.

Dr. Fiano also asked about Dr. Wodushek's "second opinion," obtained at Dr. Leehey's request, regarding Johnson's cognitive functioning. (*Id.*) Dr. Fiano emphasized that Dr. Wodushek, like Dr. Bermundez, "identified problems with test validity." (*Id.*) Dr. Fiano's summary of the conversation again contains nothing about whether Dr. Leehey ever directly responded to the question. However, Dr. Leehey offered that Johnson's central nervous system had become "extra sensitive" and, consequently, Johnson "presents with 'a little bit of this and little bit of that, and her perception of this is overwhelming.'" (*Id.*) "Dr. Leehey acknowledged," however, "that what she is able to measure objectively is not that significant. Even so, Dr. Leehey said she feels that [Johnson] 'can't do the job she did before, but I can see we can't measure a lot of disability.'" (*Id.*) Dr. Leehey also stated that her prescribed work restrictions were "related to fatigue[,] and said 'the whole syndrome is the reason' [Johnson] cannot work." (*Id.*)

Dr. Fiano, for her own analysis, summarized Johnson's extensive medical records (R. at 1676–81) and ultimately opined that the record did not support any disabling mental, cognitive, or behavioral impairment (R. at 1681–82). She concluded, "Overall, [Johnson's] self-report is not considered a reliable source of data, and objective measures have shown less than optimal effort on testing." (R. at 1682.)

18

The physician's peer review report that LINA received as part of evaluating Johnson's appeal was dated December 2, 2013, and authored by Dr. Frank Polanco, whose specialty is occupational medicine.  (R. at 1673.)  As he prepared his report, Dr. Polanco spent four days attempting to contact Dr. Leehey by telephone, but he never received a return call.  (R. at 1667.)  Dr. Polanco also attempted to speak with Drs. Rollins and Weinberger, but only managed to speak with "Cliff, the assistant for both providers," who stated that "no restrictions were placed on [Johnson]" by Drs. Rollins and Weinberger.  (*Id*.)  "This," said Cliff, "was left to the other treating providers."  (*Id*.)

Following this account, Dr. Polanco, like Dr. Fiano, summarized Johnson's medical records going back to 2010.  (R. at 1668–71.)  Dr. Polanco found that Johnson's hypotensive incident during pulmonary testing, as reported to LINA by Dr. Rollins in May 2013, supported certain functional limitations, specifically, only occasional lifting and carrying of 20 pounds.  (R. at 1671.)  Dr. Polanco also "recommended that [Johnson] not perform commercial driving (although she is noted to be driving per the records), work around heavy machinery or at heights."  (*Id*.)  But Dr. Polanco opined that "[c]linical and neurological examinations reported are essentially unremarkable with no clinical findings that would limit normal and routine activities such as standing, walking, sitting, or use of upper and lower extremities."  (R. at 1671–72.)

By letter dated December 13, 2013, LINA informed Johnson that it had affirmed its prior decision to terminate benefits.  (R. at 484.)  LINA's explanation summarized the medical records and opinions received since it made its original decision, with emphasis

19

on Dr. Rollins's report of the hypotensive incident during pulmonary testing, Dr.

Wodushek's report, and the peer review reports from Dr. Fiano and Dr. Polanco

(particularly Dr. Fiano's report of her conversation with Dr. Leehey).  (R. at 485–87.)

Given LINA's decision on appeal, LINA informed Johnson that she could

immediately file an ERISA lawsuit.  (R. at 488.)  LINA also stated, however, that

Johnson could file a second appeal, which LINA would consider if Johnson had

"different or additional information to submit."  (*Id.*)

## G.     Second Appeal

In February 2014, Johnston announced her intent to file a second appeal, and

formally filed that appeal in May 2014.  (ECF No. 51 at 36, ¶¶ 101–02.)  The formal

appeal included an April 2014 letter from Dr. Leehey regarding Dr. Fiano's report of

their telephone conversation.  Dr. Leehey stated that Dr. Fiano's report

> does not represent my medical opinion very well.  I should
> not have said that "we can't measure a lot of disability".  I do
> not measure disability; I measure signs.  Ms. Johnson has
> cognitive deficits, tremor, gait instability and an abnormal
> drop in her blood pressure when going from lying to
> standing.  She reports a number of symptoms, e.g., fatigue,
> that in conjunction with her neurological findings have led
> me to diagnose her with central sensitivity syndrome.  It is
> these signs and symptoms *in total* that, in my opinion, would
> result in disability.

(R. at 2574 (emphasis in original).)

Johnson's second appeal also included a letter from Dr. Laur M. Birlea, a

neurologist who was treating Johnson specifically "for her chronic migraine[s]."  (R. at

2596.)  Dr. Birlea reported "frequent headaches [that] are worsened by and prevent her

from doing even routine activities during an episode."  (*Id.*)  Given Johnson's various

other diagnoses, "especially autonomic dysfunction, chronic fatigue syndrome, [and] pulmonary and gastrointestinal chronic conditions, the treatment options for migraine have been limited and she continues to suffer from disabling chronic migraine[s], making her unable to work." (*Id*.) Dr. Birlea also noted that *The Lancet* reported in 2012 that chronic migraine is "the 4th most common disabling condition in women." (*Id*.)

In addition, Johnson submitted a letter from another neurologist, Dr. Andreas Michas-Martin. (R. at 2475.) Dr. Michas-Martin's relationship to Johnson is unclear. Like Drs. Leehey, Pocsine, and Birlea, he is a member of the University of Colorado Hospital's neurology department, but the parties have not pointed the Court to anything in the record showing that he treated Johnson. In any event, apparently drawing on his department's treatment records going back to 2010, Dr. Michas-Martin stated that Johnson "has multiple medical conditions that in sum are disabling and that, along with cognitive difficulties, preclude her from working as a financial consultant or in any comparable capacity." (*Id*.)

By letter dated October 7, 2014, LINA again affirmed its decision to terminate benefits. (R. at 476.) LINA found nothing in the second-appeal submissions that changed its conclusion that Johnson suffers from no true disability. (R. at 477.) Johnson then filed this lawsuit. (ECF No. 1.)

## II.  STANDARD OF REVIEW

ERISA governs employee benefit plans, including disability benefit plans. 29 U.S.C. §§ 1101 *et seq*. "When an individual covered by the plan makes a claim for

benefits, the administrator gathers evidence, including the evidentiary submissions of the claimant, and determines under the plan's terms whether or not to grant benefits.  If the administrator denies the claim, the claimant may bring suit to recover the benefits due to him under the terms of his plan." *Jewell v. Life Ins. Co. of N. Am.*, 508 F.3d 1303, 1308 (10th Cir. 2007) (internal quotation marks omitted; alterations incorporated). Federal courts have exclusive jurisdiction over such suits, as ERISA preempts most relevant state laws.  29 U.S.C. § 1144(a).

Normally when the ERISA-governed plan at issue "gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," the plan administrator's denial of benefits is reviewed under an arbitrary-and-capricious standard.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  The Plan at issue here reserves such discretionary authority to LINA.  (R. at 3203.)  Johnson argues, however, that such a reservation is not permitted by Colorado Revised Statute § 10-3-1116(2): "An insurance policy, insurance contract, or plan that is issued in this state that offers health or disability benefits shall not contain a provision purporting to reserve discretion to the insurer, plan administrator, or claim administrator to interpret the terms of the policy, contract, or plan or to determine eligibility for benefits."  If this statute nullifies the Plan's reservation, then this Court's review of LINA's decision would be *de novo*.  *See Firestone*, 489 U.S. at 115.

In *McClenahan v. Metropolitan Life Insurance Co.*, 621 F. Supp. 2d 1135 (D. Colo. 2009), *aff'd*, 416 F. App'x 693 (10th Cir. 2011), the Hon. Robert E. Blackburn held that § 10-3-1116(2) could not be applied retroactively to ERISA plans that came into force before the statute's effective date of August 6, 2008, at least when "all of the

22

events relevant to the [appeal to the district court], including the filing of the [appeal itself]," also occurred before that date. *Id*. at 1142–43. In *Hollingshead v. Stanley Works Long Term Disability Plan*, 2012 WL 959402 (D. Colo. Mar. 21, 2012), the undersigned held that *McClenahan*'s reasoning applies equally well to ERISA claims arising entirely after August 6, 2008, so long as the plan at issue came into force before that date. *Id*. at *2.

The LINA Plan governing Johnson's claim came into force on January 1, 2002. (R. at 3166.) Thus, under *Hollingshead* and *McClenahan*, it would appear that § 10-3-1116(2) cannot apply and the Court's review would be under the arbitrary-and-capricious standard. For the first time in her reply brief, however, Johnson argues that the Plan renews itself annually—a circumstance never raised in *Hollingshead*—and therefore application of § 10-3-1116(2) cannot be considered retroactive application. (ECF No. 59 at 6–9 (citing R. at 3133, 3166 (establishing a "policy anniversary date" every January 1)).)

Given the untimeliness of the argument, but also in light of its importance, the Court solicited a surreply from LINA. (*See* ECF No. 65.)[5]  LINA does not contest that the policy anniversary date equates to a renewal. LINA's surreply instead counters with *Mustain-Wood v. Northwestern Mutual Life Insurance Co.*, 938 F. Supp. 2d 1081, 1085 (D. Colo. 2013), in which the Hon. Wiley Y. Daniel rejected an argument materially

_____

[5] LINA's surreply contains a footnote stating that "New York law governs the Plan, not Colorado law." (Id. at 2 n.1.)  This is the first mention by any party that Colorado law might not govern here, and Johnson therefore moved to strike. (ECF No. 66.)  However, LINA never actually argues from New York law, even in the surreply. Thus, LINA has already forfeited the argument on account of its untimeliness and its inadequate development, and Johnson's motion to strike will be denied as moot.

identical to Johnson's:

> If renewal of a policy automatically incorporates any and all statutes affecting a policy which were not in effect at the time of the policy's issuance, then at the time of issuance, neither party can reasonably be expected to know its obligations under a policy that may or may not be automatically altered at some future date based on the whim of Colorado's legislature.  Parties should know and understand their obligations under a policy at the time of issuance.  Therefore, I find that renewal of the policy does not automatically render it susceptible to the terms and conditions found in Colo. Rev. Stat. § 10-3-1116, and the statute does not apply to the present action.

For the reasons explained below, the undersigned reluctantly agrees with *Mustain-Wood*'s ultimate conclusion, *i.e.*, that § 10-3-1116(2) does not apply even to policies that have been renewed following its enactment.  However, with respect, the undersigned disagrees with *Mustain-Wood*'s reasoning.

In evaluating an argument similar to Johnson's, but under Illinois law, the undersigned noted that

> [o]ne answer to [*Mustain-Wood*'s reasoning] is that [the insurer's] contractual obligations remained settled up to the first renewal of the insurance Policy, at which point [the insurer] had ample notice of the . . . new requirements and an opportunity to renegotiate Plan and/or Policy terms, including by adjusting premiums.  The fact it chose not to alter any terms or raise rates confirms the untenable potential for [the insurer's] Plan/Policy to allow insurers to indefinitely postpone compliance with new insurance regulations.

*Kaferly v. Metro. Life Ins. Co.*, 189 F. Supp. 3d 1085, 1095 (D. Colo. 2016).  In *Kaferly*, the undersigned ultimately did not need to adopt this reasoning as a holding because federal courts in Illinois had already determined that an Illinois insurance regulation (similar to § 10-3-1116(2)) applies to ERISA plans renewed after the statute's effective

24

date.  *Id*. at 1095.  Nonetheless, the principle remains valid.  If renewal has no legal

significance with respect to statutes enacted before renewal, new insurance laws may

never reach those they were intended to protect.  Moreover, insurers are encouraged to

seek out every formalistic device by which they can continue administering a plan

without ever changing it in a way that might trigger application of the new laws.

Many years ago the Colorado Supreme Court adopted the view that a renewed

policy "is just as much a new contract as if issued on a form carrying a different number

than the original policy," and a renewal policy is therefore "subject to the laws in force at

the time it is effected, and at least where there is no provision in the original policy for

its renewal."  *Aronoff v. Carraher*, 361 P.2d 354, 357 (Colo. 1961) (internal quotation

marks omitted).  The last clause of this announcement—regarding whether the original

policy provides for renewal—is curious, and seems to take the Plan outside of the

General rule that renewals incorporate new enactments, given that the Plan indeed

provides for renewal every January 1.  But the Court need not speculate on the

significance of the renewal provision under case law such as *Aronoff* because, as it

turns out, § 10-3-1116(2) is more or less alone among Colorado insurance laws in

failing to specify "renewal" as an event that could trigger the application of the new

statute.

Section 10-3-1116(2) was enacted via H.B. 08-1407.  *See* 2008 Colo. Leg. Serv.

ch. 422 (West).  Section 9 of that enactment announced an effective date of August 6,

2008.  Section 9, however, stands in contrast to a large number of other Colorado

insurance enactments that specifically announce both their effective date and that the

new enactment would apply to insurance policies issued *or renewed* (and sometimes

25

reinstated) on or after that effective date.  An interesting case study is found in

Colorado Revised Statutes § 10-16-113, which specifies procedures that health

insurers must follow when denying claims for benefits—a matter of obvious significance

under ERISA.  One of § 10-16-113's amending statutes provides, "This act shall take

effect July 1, 1999, and shall apply to health benefit policies and certificates newly

issued or renewed on or after said date."  1999 Colo. Legis. Serv. ch. 111 , § 6 (S.B.

99-141) (West).  There are dozens of similar provisions in the bills by which many other

insurance laws have entered the Colorado statute books.[6]

These types of provisions are not limited to enacting bills, however.  Many

statutes, as enacted, explicitly declare their applicability to renewal policies.  A

particularly salient example is Colorado Revised Statute § 10-16-214(6).  Just like

§ 10-3-1116(2), § 10-16-214(6) addresses what certain health-related policies "shall not

contain" (in the case of § 10-16-214(6), an exclusion for injuries sustained while under

---

[6] *See, e.g.*, 2014 Colo. Legis. Serv. ch. 207, § 2 (H.B. 14-1344) (West) (electronic delivery of insurance documents: "This act applies to insurance policies issued or renewed on or after the applicable effective date of this act."); 2009 Colo. Legis. Serv. ch. 353, § 6 (H.B. 09-1338) (West) (insurers' use of genetic information: "This act shall take effect July 1, 2009, and shall apply to policies and contracts issued, delivered, renewed, or reinstated on or after said date."); 2006 Colo. Legis. Serv. ch. 118, § 3(3) (H.B. 06-1106) (West) (coverage for injuries sustained while under the influence: "The provisions of this act shall apply to sickness and accident insurance policies issued, renewed, or reinstated on or after the applicable effective date of this act."); 2005 Colo. Legis. Serv. ch. 99, § 3(3) (H.B. 05-1119) (West) (protections for deployed servicemembers: "The provisions of this act shall apply to policies issued or renewed on or after the applicable effective date of this act."); 2004 Colo. Legis. Serv. ch. 134, § 2 (H.B. 04-1026) (West) (automobile "Med Pay" coverage: "This act shall take effect July 1, 2004, and shall apply to medical payments coverage policies issued or renewed on or after said date."); 2002 Colo. Legis. Serv. ch. 106, § 2 (S.B.  02-146) (West) (Medicare: "This act shall take effect January 1, 2003, and shall apply to medicare supplement policies issued or renewed on or after said date."); 2002 Colo. Legis. Serv. ch. 208, § 4(2) (H.B. 02-1263) (West) (coverage for substance abuse treatment: "Section 1 of this act shall take effect January 1, 2003, and shall apply to all policies issued or renewed on or after said date.").

the influence of a controlled substance).  Unlike § 10-3-1116(2), however, § 10-16-214(6) announces that the "shall not contain" clause applies to policies "issued, renewed, or reinstated on or after January 1, 2007."  Similar examples abound in Colorado's insurance laws.[7]

Section 10-3-1116(2), by its plain language, refers only to policies "issued."  In contrast to dozens of other insurance-related statutes, it says nothing about renewal or reinstatement or any other event.  Given that the Colorado Legislature plainly knows how to make a new insurance law applicable to renewal policies—and routinely does so —the Court can only conclude that the Legislature intentionally omitted a renewal clause from § 10-3-1116(2) and its enacting bill.  Cf. *Breaux v. Am. Family Mut. Ins. Co.*, 554 F.3d 854, 864 (10th Cir. 2009) ("Significantly, § 10-4-710(4) did not include a reference to policies that were renewed on and after July 1, 1992.  This is in contrast to other statutes and bills that reference both issuance and renewal. . . .  The Colorado

---

[7] *See, e.g.*, Colo. Rev. Stat. § 10-4-110.8(12)(b) ("On and after January 1, 2014, an insurer shall not issue or renew a homeowner's insurance policy that requires . . . ."); *id.* § 10-4-613(1) ("The provisions of this section shall apply to all policies of insurance delivered, issued for delivery, or renewed in this state that cover motor vehicles."); *id.* § 10-4-633.5(1)(a) ("An insurer issuing or renewing automobile insurance policies subject to this part 6 shall not issue or renew a policy unless the text of the policy form does not exceed the tenth-grade [reading] level . . . ."); *id.* § 10-16-104(1)(e) ("The requirements of this section shall apply to all individual sickness and accident policies issued on and after July 1, 1975, and to all blanket and group sickness and accident policies issued, renewed, or reinstated on and after July 1, 1975, and to all subscriber or enrollee coverage contracts delivered or issued for delivery in this state on and after July 1, 1975."); *id.* § 10-16-104(1.3)(b)(I) ("All individual and group sickness and accident insurance policies or contracts issued or renewed by an entity subject to part 2 of this article on or after January 1, 2008, and all service or indemnity contracts issued or renewed by an entity subject to part 3 or 4 of this article on or after January 1, 2008, that include dependent coverage shall provide coverage for . . . ."); *id.* § 10-16-201(4)(a) ("No policy of sickness and accident insurance issued, renewed, or reinstated shall contain any provision which limits or excludes payments under hospital or medical benefits coverage to or on behalf of the insured because the insured or any covered dependent is eligible for or receiving [public medical assistance].").

Supreme Court's application of the canons of statutory construction to look first to the plain meaning of a statute suggests that the inclusion of 'issued' necessarily excludes 'issued or renewed.'"").  Thus, the Court is constrained to hold that § 10-3-1116(2) does not govern, despite the Plan's annual renewal many times since the enactment of § 10-3-1116(2).  The Court will therefore analyze LINA's decision under the arbitrary and capricious standard.[8]

### III.  ANALYSIS

### A.    Effect of Conflict of Interest

The parties agree that LINA both evaluates and pays any claim for benefits. LINA therefore has an inherent conflict of interest between its own desire to turn a profit and its fiduciary duty to fairly evaluate all claims.  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008).  The effect of that conflict of interest, if any, is one factor that this Court must consider when evaluating whether LINA's decision was arbitrary and capricious.  *Id.* at 117.

Johnson presents a rather elaborate argument for giving great weight to LINA's conflict of interest.  Working from discovery the Court permitted into LINA's compensation of third-party reviewers, Johnson repeatedly points out the many thousands of dollars LINA has paid to these reviewers over the last few years, as well as the fee each reviewer received specifically to evaluate Johnson's file.  Although Johnson's payment data might naturally raise eyebrows, it ultimately proves too much.

---

[8] The irony that nearly a decade after its enactment §10-3-1116(2) has yet to bring within its remedial standard of review provision benefit plan participants like Johnson cannot be gainsaid.  But this state of affairs can only be rectified via future action by the Colorado Legislature, and not by an order of this Court.

If LINA does *not* hire third-party reviewers to evaluate claims, LINA will face even more criticism for failing to seek an outside opinion.  These third-party reviewers naturally require payment, and it is unsurprising that their rates are relatively high given their medical training.

Moreover, this is not a case in which all reviewers paid by LINA offered an unfavorable opinion and all of Johnson's providers offered a favorable opinion.  After LINA's initial denial of "regular occupation" benefits, it referred Johnson's appeal to a psychologist, Dr. Lintott, who took Johnson's side.  Despite a simultaneous referral to a physician who offered an opinion unfavorable to Johnson, LINA reversed its denial and began paying benefits.  (*See* Part I.C, above.)  Conversely, Dr. Wodushek's report partially supports LINA's belief that Johnson has been intentionally withholding effort during cognitive tests—and Dr. Wodushek is a colleague of Dr. Leehey in the University of Colorado Health System.  (*See* Part I.F, above.)

Considering all of this, the Court finds that LINA's inherent conflict of interest had no discernible effect on its evaluation of Johnson's eligibility for "any occupation" benefits, or on its evaluation of her appeals.  The Court will therefore not discuss the conflict of interest further.

**B.     Investigation and Termination of Benefits**

1.     Job Categorization

Johnson claims that LINA incorrectly categorized her previous profession as "registered representative," allegedly leading LINA to mistakenly conclude that Johnson could perform that job.  (ECF No. 51 at 45–50.)  The Court disagrees.  The Dictionary

of Occupation Titles describes "registered representative" as follows:

> REGISTERED REPRESENTATIVE (financial) alternate titles: account executive; broker; investment executive; securities broker; stock-broker[.]  Sells financial products and services to clients for investment purposes, applying knowledge of securities, investment plans, market conditions, regulations, and financial situation of clients[.]  Identifies potential clients, using advertising campaigns, mailing lists, and personal contacts.  Solicits business from potential clients.  Interviews clients to determine financial position, resources, assets available to invest, and financial goals.  Provides clients with information and advice on purchase or sale of securities, financial services, and investment plans, based on review of professional publications and other financial literature, and knowledge of securities market and financial services industry.  Completes sales order tickets and submits completed tickets to support personnel for processing of client requested transaction.  Must pass state examination to receive license and become registered to sell securities.  May read status reports and perform calculations to monitor client accounts and verify transactions.  May work for firm that offers discounted brokerage fees and does not offer advice to clients.  May develop and implement financial plans, and sell insurance, real estate, or securities.

See http://www.occupationalinfo.org/25/250257018.html.[9]  This appropriately tracks

Johnson's self-described occupational duties.  Indeed, her own attorney at one point

submitted a job description to LINA that listed "registered representative" as an

_____

[9] This Internet citation comes from LINA's brief (ECF No. 55 at 43), to which Johnson objects as "extra-record information intended to bolster LINA's decision to terminate benefits" (ECF No. 59 at 14 n.12).  To the extent Johnson means to argue that Colella (the LINA employee who selected this occupational title) never actually consulted the DOT, Colella's record of the reclassification indicates otherwise. (*See* R. at 221.)  To the extent Johnson means to argue that the definitional text on which Colella relied is not in the record, the DOT is subject to judicial notice.  *See, e.g.*, *Hubbard v. Comm'r of Soc. Sec.*, 348 F. App'x 551, 553 n.1 (11th Cir. 2009); *Evans v. Metro. Life Ins. Co.*, 190 F. App'x 429, 437 n.7 (6th Cir. 2006).  Johnson has not argued that the Internet citation above does not generate the proper definition of "registered representative," and the Court's own Westlaw search (as of March 20, 2017) revealed 285 federal cases citing to this very website, thus establishing its pervasive use as an acceptable reference source.  The Court therefore takes judicial notice of this definition.

alternate title to the "personal financial advisor" title advocated by the attorney.  (R. at 799; *see also* ECF No. 51 at 22, ¶ 41.)  LINA did not abuse its discretion, or otherwise err, in determining that Johnson had worked as a registered representative.

2.   Conflicting Evidence

As thoroughly described in Part I.E, above, LINA's "any occupation" investigation developed conflicting evidence, particularly statements from her physicians suggesting that her symptoms, to the extent they previously existed, had abated to a substantial degree.  LINA requested video surveillance and discovered that, on the days in question, Johnson could push a stroller and walk her dogs for thirty-five minutes with no assistance and no apparent problem—in contrast to her self-reported need for oxygen simply to walk up stairs, and need for "help" to go on a walk of 15–20 minutes.  LINA also discovered that Johnson could drive more than her self-reported "few miles," and could generally be more active than she previously represented.

"Reliance on surveillance evidence *in conjunction with* medical evidence is not improper."  *Rizzi v. Hartford Life & Acc. Inc. Co.*, 383 F. App'x 738, 752 (10th Cir. 2010) (emphasis in original).  As noted, LINA already had equivocal medical evidence.  It then developed the record further by referring Johnson to Dr. Bermundez.  At that visit, Johnson's oxygen tank reappeared, and Dr. Bermundez noticed signs of feigning tremors.  Dr. Bermundez also concluded that Johnson's cognitive testing scores were consistent with intentional limitation of her abilities.

Before making any decision based on Dr. Bermundez's opinions, LINA sent his report to Johnson's primary treating physicians.  The only response it received was from Dr. Weinberger, who stated simply that Johnson's pacemaker had not resolved

her episodes of syncope—a matter having nothing necessarily to do with

Dr. Bermundez's conclusions and otherwise addressed in Dr. Bermundez's report that

Johnson told him her syncopal episodes are manageable as long as she does not

stand up too quickly.  LINA also had an in-house physician, Dr. Minteer, review the file.

Based on all this, LINA concluded that Johnson possessed the capacity to perform her

previous job, which also met the 80% wage requirement in the Plan.  Given LINA's

investigation and the information developed, the Court cannot say that LINA behaved

arbitrarily or capriciously in finding that Johnson would not qualify for "any occupation"

benefits.

## C.     First Appeal

During the First Appeal (*see* Part I.F, above), LINA received additional

statements from Johnson's treating physicians in support of Johnson's claim of

disability, but LINA also received more evidence supporting its prior decision.  For

example, independent of any individual with which LINA may have contracted,

Dr. Wodushek reached conclusions consistent with Dr. Bermundez that Johnson

intentionally limits her cognitive abilities under testing.  LINA's reviewers also spoke with

some of Johnson's providers on the telephone and learned that they were somewhat

more equivocal about Johnson's conditions than their written statements would

suggest.  The Court therefore finds that LINA possessed substantial evidence during

the First Appeal to affirm its termination of benefits.

## D.     Second Appeal

Johnson's only argument specific to the Second Appeal is that LINA refused to

consider the documents she submitted in connection with that appeal, thus allegedly

demonstrating arbitrary and capricious conduct designed to frustrate her rights.  (ECF

No. 51 at 88–89.)  LINA indeed originally announced that it would not review Johnson's

submissions because they did not comprise "new medical information."  (R. at 490,

491.)  But LINA eventually changed course and accepted all documents submitted by

Johnson.  (R. at 482.)  LINA pointed out as much in its response brief in these

proceedings (ECF No. 55 at 83), and Johnson's reply brief contains no rejoinder or

reprisal of the argument (*see generally* ECF No. 59).  Johnson's argument regarding

the Second Appeal is therefore meritless.

## E.     Consideration of Social Security Award

As noted above (Part I.D), the SSA declared Johnson disabled in June 2011.

That is one factor LINA was required to consider in evaluating Johnson's disability

status.  *See, e.g.*, *Torrey v. Qwest Commc'ns Int'l, Inc.*, 838 F. Supp. 2d 1201, 1210 (D.

Colo. 2012).  Johnson acknowledges that all three of LINA's decision letters state that

LINA considered her SSA award.  (ECF No. 51 at 81 (citing R. at 477, 487, 499–500).)

More specifically, LINA's first letter notes that LINA had obtained Johnson's SSA file,

found that "[a]ll the information [there] was from 2010 and 2011," and concluded that

"[t]he new medical information on file shows improvement with [the] impairments [found

to exist by the SSA]."  (R. at 499–500.)  Thus, said LINA, "[w]e considered [the SSA

findings] but had more recent information."  (*Id*. at 500.)  LINA's second letter similarly

noted that the SSA had not reevaluated Johnson since its initial award; "[t]herefore, we

have the most current medical information on file regarding [Johnson's] condition."

(R. at 487.)  Finally, the third letter, states that LINA "confirmed that there is no new information in Ms. Johnson's Social Security file . . . .  As a result, we are in receipt of more recent information than the SSA had to consider at the time of its decision."  (R. at 477.)

Johnson at times characterizes this as a "complete failure to reconcile" the SSA's conclusions with LINA's conclusions.  (ECF No. 51 at 77 (formatting normalized).)  To the contrary, LINA was explicit in its reasoning, and its reasoning was not arbitrary or capricious.  No party disputes that LINA had more information than the SSA had at all relevant times.

Johnson's real argument appears to be as follows: "LINA's claim that Johnson's chronic incurable conditions had improved since the date of the [SSA] decision is not at all supported by the record."  (*Id*. at 81.)  For the reasons already explained above, this is incorrect.  Substantial evidence supports LINA's position that Johnson's conditions had abated to a meaningful degree.

The Court accordingly finds no error in LINA's consideration of the SSA award.

**F.   Demands for Policy Documents**

Between 2011 and 2014, Johnson made several requests to LINA for a copy of her claim file.  (*See* ECF No. 51 at 21–36, ¶¶ 34, 90, 95, 101.)  Johnson argues that LINA's failure to provide the requested information within thirty days subjects it to statutory penalties.  (ECF No. 51 at 91.)  The statute on which Johnson relies is 29 U.S.C. § 1132(c)(1), which reads in relevant part as follows:

> Any administrator . . . who fails or refuses to comply with a
> request for any information which such administrator is
> required by this subchapter to furnish to a participant or

> beneficiary . . . by mailing the material requested to the last
> known address of the requesting participant or beneficiary
> within 30 days after such request may in the court's
> discretion be personally liable to such participant or
> beneficiary in the amount of up to $100 a day from the date
> of such failure or refusal, and the court may in its discretion
> order such other relief as it deems proper.

As LINA points out (ECF No. 55 at 1), the Tenth Circuit held in *Thorpe v. Retirement Plan of Pillsbury Co.*, 80 F.3d 439, 444 (10th Cir. 1996), that "causes of action [under 29 U.S.C. § 1132(c)(1)] may be brought only against designated plan administrators."  UBS, not LINA, is the designated plan administrator here.  (R. at 3209.)  Thus, says LINA, this penalty provision is unavailable.  Johnson replies that the *Thorpe* case did not involve a distinction between a plan administrator and claim administrator, and nothing in 29 U.S.C. § 1132(c)(1) or *Thorpe* precludes a finding that a claim administrator such as LINA can be liable to the same extent as a plan administrator, given the statute's applicability to "[a]ny administrator."  (ECF No. 59 at 33–34.)

The Court need not resolve this argument.  Even if Johnson is correct, the assessment of a penalty is explicitly "in the court's discretion."  Among the considerations that may guide to the Court's discretion is whether the claimant suffered any prejudice or injury from the delay.  *Rosile v. Aetna Life Ins. Co.*, 777 F. Supp. 862, 874–75 (D. Kan. 1991), *aff'd*, 972 F.2d 357 (10th Cir. 1992) (table).  Johnson asserts no true prejudice due to LINA's nonresponsiveness (*see* ECF No. 51 at 84–88), nor can the Court discern any prejudice on this record.  Accordingly, assuming 29 U.S.C. § 1132(c)(1) applies to LINA, the Court in its discretion declines to award any penalty under that statute.

**IV.  CONCLUSION**

For the reasons set forth above, the Court ORDERS as follows:

1. Plaintiff's Motion for Bench Trial on the Record (ECF No. 57) and the parties'
   Joint Motion for Determination (ECF No. 61) are GRANTED;

2. Johnson's Motion to Strike (ECF No. 66) is DENIED AS MOOT;

3. Defendant's decision to terminate benefits is AFFIRMED;

4. The Clerk shall enter final judgment in favor of Defendant and against Plaintiff;
   and

5. The parties shall bear their own attorney's fees and costs.

Dated this 28th day of March, 2017.

BY THE COURT:

_____
William J. Martínez
United States District Judge